**Bruni v. Exxon Corp.**

C.P. of Allegheny County, no. GD94-17270.

*Alan Miller,* for plaintiffs.
*Robert Lehman* and *Gary Hunt,* for defendant Exxon Corp.
*Zan Ivan Hodzic,* for Shipeek.
*David Regoli,* for defendant Nichols.

HORGOS, *J.,* June 13, 2001—Plaintiffs filed a complaint in civil action as a class action against defendants, Exxon Corporation and Ronald S. Nichols, t/d/b/a Ron's Exxon, seeking compensatory and punitive damages sustained as a result of an alleged gasoline leak from the Exxon service station operated by Nichols. Plaintiffs have asserted claims for damages under the Pennsylvania Storage Tank and Spill Prevention Act, 35 P.S. 6021.101 et seq. as well as public nuisance, private nuisance, trespass and negligence.

The cause of action arose from plaintiffs' claim that they were exposed to toxic fumes from gasoline which leaked from Ron's Exxon, a gasoline station located at the corner of 40th Street and Penn Avenue in the City of

Pittsburgh, from approximately July 1, 1994 through January 31, 1995. Plaintiffs further claim that they suffered damages from occasional intermittent subsequent episodes caused by heavy rains which allegedly flushed gasoline residue from contaminated soil at the service station. Plaintiffs aver that gasoline was permitted to leak from the Exxon service station into adjacent underground telephone vaults, sewers and other underground structures. Fumes from this gasoline, according to plaintiffs, entered the underground sewerage system and other underground pathways and ultimately entered into the basements of dwellings and the surrounding neighborhood in an area consisting of approximately 300 residential dwelling units.

Plaintiffs seek compensatory damages for sickness, discomfort, emotional distress and the alleged trespass and substantial interference with the private use and enjoyment of their private property caused by exposure to the gasoline fumes. Plaintiffs also seek punitive damages based on Exxon's alleged willful, reckless and outrageous conduct in its denial of responsibility for the leak and the resulting extension of the period of time during which plaintiffs were exposed to the gasoline fumes. The court dismissed the counts of plaintiffs' complaint seeking punitive damages against defendants.

Following a certification hearing, the court entered an order certifying the case as a class action on June 10, 1998. The class was defined as:

"All individuals, who between July 1, 1994 and January 31, 1995, resided within an area in the Bloomfield/ Lawrenceville section of Pittsburgh bounded on the west by 39th Street, on the north by Penn Avenue, on the east

by Main Street and on the south by Howley Street and who during said period were exposed in their residences and on adjacent property to gasoline fumes from gasoline which leaked from underground storage tanks on the premises of Ron's Exxon service station located at the corner of 40th Street and Penn Avenue and who suffered compensable damages as a result of such exposure."

The case was bifurcated as to liability and damages. The first phase was tried without a jury from June 7 through June 9, 2000 and June 23 through June 26, 2000. The court will address the issue of liability in this opinion.

At trial, the following facts were established. Defendant, Exxon Corporation, was the owner of the underground storage tanks and equipment that was part of a gasoline dispensing system, including the lines and dispenser at an Exxon service station known as Ron's Exxon located at 40th Street and Penn Avenue, Pittsburgh, Pennsylvania. (Tr. 6/8/00, p. 11.) Exxon supplied all gasoline sold at Ron's Exxon. (Exxon's answer to second amended complaint, paragraph 20.) Defendant Nichols managed the operation of the service station as an independent dealer in accordance with an agreement with Exxon. (Exxon's answer to second amended complaint, paragraph 21, Tr. 6/8/00, pp. 10-11.) Nichols was responsible for the day-to-day operation of the underground storage tanks located at the station, including performing daily inventory reconciliations by gauging the level of gasoline in the tanks and comparing that with the amount of product sold in order to check for leaks from the gasoline dispensing system. (Tr. 6/8/00, pp. 13-16, 77.)

In July, 1994, Nichols discovered a measuring error and the end of month July inventory reconciliation showed a loss of gasoline. (Tr. 6/8/00, pp. 27-30.) The gasoline inventory records were provided by Nichols to Exxon on August 29, 1994 during Exxon's annual inspection of Ron's Exxon. (Tr. 6/8/00, p. 22.) On September 15, 1994, Nichols told Exxon's territory manager, Lorraine Pryhuber, that he had detected a loss of plus grade in August. (Pryhuber depo., pp. 39, 48; plaintiffs' exhibit 19.) By September 23, 1994, Lorraine Pryhuber was aware of the loss of gasoline at Ron's Exxon. (Pryhuber depo., pp. 76, 86, 89; plaintiffs' exhibit 28.) Ms. Pryhuber prepared a memorandum for Daneen Zeno, an environmental specialist in charge of Exxon's investigation, and Exxon's Jack Adams. (Plaintiffs' exhibit 28.) No report was made to the DER at that time.

Individuals in the neighborhood began smelling gasoline odors in their homes sometime in late July to early August 1994. (Tr. 2/3/97, p. 61; Tr. 6/7/00, pp. 11, 92, 135, 158, 196-97; Tr. 6/8/00, p. 155.) Calls complaining of the gasoline fumes to the Pittsburgh Fire Bureau began around this time. (Tr. 2/3/97, p. 38.) Class representative Arthur Nardini spoke to various neighbors and contacted DER, the fire department and the health department about the gasoline odors. (Tr. 6/7/00, pp. 17-19.) Based on complaints of gasoline odors in the area, DER began its investigation and on September 13, 1994, DER's Michael Hartley visited the neighborhood and smelled gasoline odors. (Tr. 6/8/00, p. 103.) On September 23, 1994, the Pittsburgh Fire Bureau, DER, and the Allegheny County Health Department investigated Ron's

Exxon as the possible source of gasoline odors and fumes reported by plaintiffs as invading their homes. (Exxon's answer to second amended complaint, paragraph 25; Tr. 6/8/00, pp. 74-80.) Fire bureau personnel, including Captain Thomas Kelly, went into various homes, including the homes of representative plaintiffs Nardini, Durkin and Wisniewski and smelled gasoline. (Tr. 2/3/97, pp. 44-45.)

On September 23, 1994, the fire bureau ordered Ron's Exxon to shut down based on its determination that a release of gasoline had occurred at the station and based on large quantities of gasoline found in the underground Bell Atlantic vaults at the corner of 40th Street and Penn Avenue. (Tr. 2/3/97, pp. 39-41, 45-46; Zeno depo., pp. 60-61.) On September 26, 1994, Captain Kelly allowed the station to reopen after the line leaks were repaired. (Tr. 2/3/97, p. 50.)

Residents continued to call various investigating agencies to report gasoline fumes, and gasoline odors were detected by fire bureau personnel on several occasions during September through December 5, 1994 at various locations through the neighborhood. (Tr. 2/3/97, pp. 53, 71, 76-80, 92-93.) During this period, the fire bureau set up a 911 number for residents in the area to call if they had gasoline vapors. (Tr. 2/3/97, p. 74.) The fire bureau responded to numerous calls complaining of gasoline odors. (Tr. 6/7/00, p. 148.)

Captain Kelly of the Pittsburgh Fire Bureau testified that there was "no doubt in my mind" that it was gasoline vapors present in the homes of the plaintiffs. (Tr. 2/3/97, p. 45.) Samples of air collected by the Allegheny County Health Department and consultants for plaintiffs

showed the presence of the constituents of gasoline, *i.e.* benzene, toluene, ethylbenzene and xylene. (Tr. 6/26-28/ 00, p. 48; plaintiffs' exhibits 197 A-D.) On October 5, 1994, DER and the fire bureau held a meeting with Exxon and DER required Exxon to conduct an investigation of its property to determine the extent of the contamination problem and address what the agency viewed as an immediate problem of gasoline vapors in the sewers and in the homes of the plaintiffs. (Tr. 6/8/00, p. 82.) DER concluded that there was a gasoline problem in the neighborhood that originated from Ron's Exxon station and wanted Exxon to implement interim remedial measures. (Tr. 6/8/00, pp. 87, 115-16.)

Exxon took various remedial measures including the installation of vapor extractors at the corner of 40th Street and Penn Avenue on its own property and one over the Bell vault. (Tr. 2/3/97, pp. 58-60; Tr. 6/8/00, p. 117.) On October 10, 1994, the fire bureau again ordered the station shut down. (Tr. 2/3/97, p. 59.) Exxon continued to conduct chemical tests in the area and concluded that the problem did not emanate from Ron's Exxon. The Exxon station was allowed to reopen on October 13, 1994. (Tr. 2/3/97, p. 61.) Continuing reports of gasoline vapors invading plaintiffs' homes and the neighborhood led to an order closing the station again on October 14, 1994 while the fire hydrants in the neighborhood were turned on and the sewers flushed. (Tr. 2/3/97, p. 61.)

On October 27, 1994, the DER determined that Exxon's remedial measures had been ineffective in preventing the offsite migration of vapors and petroleum product and directed Exxon to take additional remedial measures. On November 1, 1994, the fire bureau found

another release under one of Exxon's dispensers due to a leaking valve. (Tr. 2/3/97, p. 89; Zeno depo., p. 252.) On November 1, 1994, the fire bureau again ordered that the Exxon station be closed because it was believed to be the source of the gasoline vapor problem in the neighborhood. (Tr. 2/3/97, pp. 85-86.) Exxon continued to take remedial measures including the excavation of contaminated soil and to intercept the gasoline flowing offsite.

Plaintiffs offered the testimony of David R. Perry who is a registered professional geologist in Pennsylvania. Mr. Perry has conducted thousands of investigations of soil and groundwater contamination occurring underground and owns American GeoSciences, a Murrysville company, which concentrates in environmental investigations involving the location and migration of contaminants in soil and groundwater. (Tr. 7/17/97, pp. 7-10; Tr. 6/9/00, p. 162.) Based on a review of the reports prepared by Exxon's consultants, the information generated by DER, the Allegheny County Health Department and the fire bureau, reports prepared by Exxon's expert and the testimony of various plaintiffs, Mr. Perry concluded that Ron's Exxon was the only source of gasoline vapors detected by plaintiffs in their homes. (Tr. 6/9/00, pp. 56, 139, 151-53.) Mr. Perry concluded that the soils and groundwater at the Exxon station were contaminated with the constituents of gasoline at levels far exceeding any statewide regulatory criteria. (Tr. 6/9/00, pp. 57, 60.) Mr. Perry also examined other potential sources of vapors to the plaintiffs' homes in the class area. He evaluated other sites including the Atlantic service station in the same neighborhood and Fisk Auto, where seven abandoned underground storage tanks were removed. Mr. Perry con-

cluded that the contamination of Fisk Auto was localized and did not cause any offsite contamination. (Tr. 6/9/00, pp. 73-74; Tr. 6/26-28/00, p. 41.) Mr. Perry also concluded that the contamination at the Atlantic service station site was minor and that there were no preferential pathways for vapors to travel off that site. (Tr. 6/9/00, pp. 70-71.) Moreover, DER's Mr. Hartley also concluded that Fisk Auto was not the cause of any offsite problems. (Tr. 6/8/00, p. 95). This is the same conclusion as reached by Mr. Perry. (Tr. 6/9/00, pp. 72-73.)

Defendant's expert, Mr. McNally, identified various other possible sources of the gasoline vapors, but he failed to state to a reasonable degree of certainty that any of them caused the vapors in the homes of the plaintiffs. (Tr. 6/26-28/00, pp. 443-53, 544-47.) On the other hand, Mr. Perry explained the nature of the release of gasoline at the Exxon station, noting that more than 200 gallons of gasoline were spilled at the station, causing contamination of the soils and groundwater both on and off the station. (Tr. 6/9/00, pp. 60-61.) Mr. Perry convincingly explained the manner in which the large amount of gasoline which flowed offsite to the Bell Atlantic vault volatilized, with the resulting vapors traveling in all directions along the telephone vault and conduit system along Penn Avenue and along sewer lines and other conduits into plaintiffs' homes. (Tr. 6/9/00, pp. 62-111.) In sum, the court finds the testimony of plaintiffs' expert, David Perry, that the release from the Exxon station was the cause of the vapors in plaintiffs' homes to be credible.

Defendant has argued at all stages of the proceedings that plaintiffs may not recover damages for personal injuries under the Tank Act. This court must follow the

interpretation of the Tank Act and the principles regarding the citizen suit provisions under the Act set forth by the Pennsylvania Supreme Court in *Centolanza v. Lehigh Valley Dairies Inc.,* 540 Pa. 398, 658 A.2d 336 (1995) and the Pennsylvania Superior Court in *Wack v. Farmland Industries Inc.,* 744 A.2d 265 (Pa. Super. 1999).

The Tank Act was enacted to prevent releases of petroleum and other regulated substances from storage tanks, to provide liability for damages sustained in violation of the Act and to require prompt cleanup of the releases regulated by the Act. 35 P.S. 6021.102(b). Section 1305 of the Tank Act grants a citizen the right to "compel compliance" with the Act. In *Centolanza,* the Pennsylvania Supreme Court interpreted this citizen suit provision of the Act to mean that a person may maintain an action under the Tank Act to recover costs for clean up and diminution in property value. *Id.,* 540 Pa. at 404, 658 A.2d at 340. The court examined the Act's goal of promoting prompt cleanup and reasoned that the Act must be liberally construed to create a private cause of action because it is a remedial statute and there is no language to the contrary in the Act.

The Pennsylvania Superior Court further expanded the "compel compliance" language of the Tank Act and held that a private citizen may bring an action for personal injury pursuant to the Tank Act. The Superior Court relied on the Pennsylvania Supreme Court's analysis in *Centolanza* that the purpose of the Act is to "provide liability for damages within this Commonwealth as a result of a release" and the Supreme Court's directive to interpret section 6021.1305 liberally. *Wack, supra.* 744 A.2d at 269.

Both the Pennsylvania Supreme Court in *Centolanza* and the Pennsylvania Superior Court in *Wack* spoke clearly and definitively regarding a private citizen's right to bring an action under the Tank Act. In *Centolanza,* the Supreme Court held that the Act permits private actions to recover costs for cleanup and diminution of property value; in *Wack,* the Superior Court held that an individual may maintain a claim for personal injury under the Act. Accordingly, this court finds that there is no bar to plaintiffs' action for cleanup costs and personal injuries sustained by plaintiffs if caused by the leakage from the storage tanks owned or operated by defendants.

Defendants also argue that plaintiffs failed to comply with the notice requirements of the Tank Act. In order to assert a cause of action under section 1305(c), plaintiffs must give notice to the alleged violator and DER 60 days before filing suit. Section 1305(e) provides that such notice is not required when there is a violation which is an "imminent threat to the health or safety of the plaintiff or would immediately effect a legal interest of the plaintiff." 35 P.S. 6021.1305(e). It is not disputed that plaintiffs did not give 60 days notice to defendants or DER prior to filing suit.

The gasoline released from the Exxon station was flowing offsite into telephone vaults and the gasoline vapors were entering the homes of the plaintiffs when notice was given on October 7, 1994 and when the complaint was filed on October 28, 1994. Individuals in the area called the fire bureau to complain about gasoline fumes in late July or early August 1994. (Tr. 2/3/97, p. 38.) DER began its investigation in the area in September 1994 and the Pittsburgh Fire Bureau, DER and the Allegheny

County Health Department investigated Ron's Exxon as a possible source of the gasoline odors on September 23, 1994. The fire bureau ordered Ron's Exxon to shut down on September 23, 1994 based on its determination that a release of gasoline had occurred at the station and based on the large quantities of gasoline found in the underground Bell Atlantic vaults nearby. (Tr. 2/3/97, pp. 39-41, 45-46; Zeno depo., pp. 60-61.) Again on October 10, 1994, the fire bureau ordered Ron's Exxon to close. (Tr. 2/3/97, p. 59.) In addition, samples of air collected by the Allegheny County Health Department and consultants for plaintiffs in the homes of several plaintiffs showed the presence of constituents of gasoline, *i.e.,* benzene, toluene, ethylbenzene and xylene. (Tr. 6/26-28/00, p. 48, plaintiffs' exhibits 197 A-D; plaintiffs' exhibits 260 A-L.) Further, DER and the fire bureau held a meeting with Exxon on October 5, 1994 and required Exxon to conduct an investigation of its property to determine the extent of the contamination and address the problem of the gasoline vapors in the sewers and residences. DER instructed Exxon to implement interim remedial measures to "stop the migration of gasoline off the property into the vault and sewers." (Tr. 6/8/00, pp. 115-16.)

These incidents are only a sampling of the many such incidents from which the inference of the threat of imminent harm may be drawn. In such a situation, where the violation complained of constitutes an imminent threat to the health or safety of the plaintiffs, the notice provision of section 6021.1305(d) may be waived.

Defendants also argue that plaintiffs do not have a claim under section 1305(c) of the Act because DER was diligently enforcing the Tank Act prior to the commence-

ment of this action and Exxon was voluntarily engaging in corrective action under DER's oversight. The Act precludes a private action under certain circumstances:

"No such action may be commenced where the department has commenced and is diligently prosecuting a civil action in a court of the United States or the Commonwealth or is in litigation before the Environmental Hearing Board to require the alleged violator to comply with this Act or any rule, regulation or permit issued under this Act." Section 35 P.S. 6021.1305(c).

There is certainly a logical basis to defendants' argument. It is undisputed that DER was supervising cleanup efforts and that Exxon was taking some remedial action. Plaintiffs sought no injunctive relief to "compel compliance" with the Tank Act. Defendant argues that if a violator of the Act could only avoid private citizen damage suits under the Act by forcing DER to file an action under 35 P.S. 6021.1305(a), the remedial goals of the Act would be frustrated because voluntary, prompt cleanups of contamination by responsible parties would be discouraged.

The language of the statute, however, is clear that unless the department has commenced a civil action, a private action is permitted. The DER's involvement in the situation is not equivalent to "commencing and diligently prosecuting a civil action in a court . . . ." This court cannot disregard the clear language of the Act. Construing the Act to preclude a private action when the DER involvement falls short of the "commencement" of an enforcement action in court would not only run afoul of the clear language of the statute but would also ignore the Pennsylvania Supreme Court's directive that the pri-

vate action provision of section 1305(c) be liberally construed to effectuate the purposes of the Act. *Centolanza, supra,* 540 Pa. at 405, 658 A.2d at 340. The DER did not commence any action in court against Exxon. This court is bound by the clear language of the Act and the instruction of the Pennsylvania Supreme Court and therefore finds that the plaintiffs' private action under section 1305(c) is proper.

Moreover, plaintiffs correctly point out that the same statutory language exists in the Federal Clean Water Act, 33 U.S.C. §1365(b), which provides that a citizen suit may not be commenced if the USEPA or the state has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a state, to require compliance with the standard. Courts construing this language have held that the phrase "commencing and diligently prosecuting a civil action in a court" means just that: the federal or state agency must have commenced an actual civil action in a court against the violator before a citizen suit is precluded. See *Illinois Public Interest Research Group v. PMC,* 835 F. Supp. 1070 (N.D. Ill. 1993); *Weielisco Creek Watershed v. Kocher Coal,* 641 F. Supp. 712 (E.D. Pa. 1986). The court can find no basis on which to interpret identical language in the Tank Act differently and must conclude that plaintiffs' civil suit is permitted under these circumstances.

Section 6021.1311 of the Tank Act contains a rebuttable presumption of liability which shifts the burden of proof to the defendants. The Pennsylvania Supreme Court has held that the presumption is available in a private action because a private action brought under the Tank Act is no different than one brought by the Common-

wealth. *Centolanza v. Lehigh Valley Dairies Inc., supra,* 540 Pa. at 407, 658 A.2d at 341.

Section 1311 of the Tank Act provides:

"General rule—except as provided in subsection (b), it shall be presumed as a rebuttable presumption of law in civil and administrative proceedings that a person who owns or operates an aboveground or underground storage tank shall be liable, without proof of fault, negligence, or causation for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution. Such presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution."

Therefore, in order for the presumption to apply, plaintiffs must establish that there was a release of gasoline at the Exxon station, that the substance contained in the tanks is the same substance that caused plaintiffs' damages and that plaintiffs reside within 2,500 feet of the perimeter of the Exxon service station.

Plaintiffs have attempted to expand the class to include individuals who are not within the defined class for this action. The class was defined as individuals who resided within a certain geographic area between July 1, 1994 and January 31, 1995. (See order of court, 6/10/98 *supra*.) Plaintiffs now seek to include the owners and employees of businesses located in the area and City of Pittsburgh firemen who occasionally stayed overnight at the firehouse within the defined class area. These individuals who did not reside within the geographic area

as set forth in the court's order of June 10, 1998 between July 1, 1994 and January 31, 1995 are not members of the class.

The presumption does apply to those plaintiffs who resided within the defined area between July 1, 1994 and January 31, 1995. There was a release of gasoline from the storage tanks located at the Exxon service station. All of the plaintiffs as defined by the court's order of June 10, 1998 reside within the 2,500 feet of the perimeter of the storage tanks at the Exxon station. The court finds from the evidence that it was clearly gasoline vapors that invaded plaintiffs' homes. The statutory 2,500 foot presumption therefore, applies.

In order to rebut the presumption, defendants must establish by clear and convincing evidence that they did not contribute to the gasoline vapors in the plaintiffs' homes. It is not enough for defendants to show that a different source contributed to the problem unless they can demonstrate that the Exxon service station did not contribute to the gasoline vapors. *Lehigh Gas and Oil Co. v. Pennsylvania Department of Environmental Resources,* 671 A.2d 241 (Pa. Commw. 1995), *appeal denied,* 546 Pa. 650, 683 A.2d 886 (1996).

Defendants failed to present clear and convincing evidence that Ron's Exxon did not contribute to the gasoline vapors in the class area. David Perry, plaintiffs' expert, explained the pathway by which gasoline released from Ron's Exxon traveled offsite, entered the Bell Atlantic telephone vaults, volatilized with the gasoline vapors migrating in all directions along the Bell Atlantic telephone vault and conduit system and then along preferential pathways into plaintiffs' homes. He further ex-

plained how gasoline and gasoline vapors would infiltrate the sewer system and would migrate inside and along the sewer system with the vapors traveling in all directions along various preferential paths of least resistance into plaintiffs' homes. (Tr. 6/9/00, pp. 62-111.) The rebuttal evidence presented by defendants' expert, Mr. McNally, failed to establish by clear and convincing evidence that Exxon did not "contribute" to the contamination and thus failed to rebut the presumption. Mr. NcNally conceded that Exxon was probably the cause of gasoline vapors to some of plaintiffs' homes. (Tr. 6/26-28/00, pp. 433, 543.)

Mr. McNally divided the class into four distinct areas. While Mr. McNally conceded that Exxon was the cause of the gasoline vapors in one area, he contended that the release from the Exxon station was not the cause of gasoline vapors in the other three areas. He was unable, however, to identify with any degree of scientific certainty any other source of the gasoline vapors in two of those areas. He conceded that there were not any confirmed sources of vapors in two of the areas to allow him to state to a reasonable degree of certainty that any of those other sources caused odors in the plaintiffs' homes. (Tr. 6/26-28/00, pp. 443, 453, 546-47.)

In the fourth area, Mr. McNally opined that seven underground storage tanks excavated from an auto mart at the corner of Fisk and Penn Avenue was the cause of the vapors. Michael Hartley, DER's hydrogeologist and the state's representative involved in the investigation of gasoline vapors in the area, clearly testified that any contamination resulting from those seven underground storage tanks was localized to that site and that Fisk Auto

did not cause any offsite impact. (Tr. 6/8/00, pp. 92-95.) Captain Kelly also testified that the fire bureau did not consider that Fisk Auto was a source of the vapor problem experienced by plaintiffs. (Tr. 2/3/97, pp. 83-84.) The testimony of Mr. Hartley and Mr. Perry was credible and persuasive and the court finds that the release from the Exxon station was a cause of the vapors in plaintiffs' homes. The court finds that defendants have failed to rebut the 2,500 foot presumption of the Tank Act and finds that defendants are liable under the Tank Act for reasonable costs of corrective action and any personal injury damages which may be established by plaintiffs.

Plaintiffs also seek an award of costs of litigation, including attorneys and expert witness fees under section 1305(f) which authorizes the court, in its discretion, to award costs of litigation "whenever the court determines such award is appropriate." 35 P.S. §6021.1105(f). Plaintiffs do not provide any compelling reasons for such an award and the court can find none. Although the court has determined that defendants are liable for damages under the Tank Act, no award of attorneys' and expert witness' fees shall be made.

Plaintiffs have also asserted tort claims for both private nuisance and public nuisance. The Restatement (Second) of Torts defines a public nuisance as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts §821B(1). A release that violates the provisions of the Tank Act constitutes a public nuisance. Section 1304 of the Tank Act provides: "a violation of this act or of any order or regulation adopted by the department or of permits issued by the department shall constitute a public nuisance." 35

P.S. §6021.1304. The statute further declares that storage tank releases are a threat to the public health and safety. 35 P.S. §6021.102(b). *Centolanza v. Lehigh Valley Dairies Inc., supra* at 478, 635 A.2d at 150.

Moreover, the Tank Act declares that "to cause the air, soil or water pollution" is unlawful conduct and a violation of the Tank Act. 35 P.S. §6021.1310. The Act also provides that the owner and operator of a storage tank "shall not allow . . . a release to occur from a storage tank." It is clear, therefore, that the violation of the Tank Act which has been established sets forth a claim for damages as a public nuisance. While the court finds defendants liable for the tort of public nuisance, the burden of proving damages which may be difficult under these circumstances, remains with the plaintiffs in the next phase of these proceedings.

Restatement (Second) of Torts defines private nuisance:

"Section 822. General rule. One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either;

"(1) intentional and unreasonable, or

"(2) unintentional and otherwise actionable under the rules controlling liability for negligence or reckless conduct, or for abnormally dangerous conditions or activities."

Plaintiffs argue that the gasoline released at the Exxon station was the cause of gasoline vapors entering plaintiffs' homes so that defendants' conduct is the legal cause

of the invasion of plaintiffs' interest in the private use and enjoyment of their land.

While the defendants' conduct cannot meet the requirement for an intentional invasion, defendants' conduct is actionable under the standards controlling liability for negligence in Pennsylvania. In fact, the release of gasoline from the station and the subsequent contamination of the soil, groundwater and the air is a violation of the Tank Act and per se negligent. In *Centolanza v. Lehigh Valley Dairies Inc.,* the Pennsylvania Superior Court in an opinion which was affirmed by the Pennsylvania Supreme Court found that violation of the Tank Act is negligence per se. *Centolanza v. Lehigh Valley Dairies Inc.,* 430 Pa. Super. 463, 478, 635 A.2d 143, 150 (1993), *aff'd,* 540 Pa. 398, 658 A.2d 336 (1995).

Plaintiffs have also asserted a trespass claim in this action. A trespass is committed when one intentionally enters land in the possession of another, or causes a thing to do so. Restatement (Second) of Torts §158; *Jones v. Wagner,* 425 Pa. Super. 102, 624 A.2d 166 (1993). "Intent" in this context means either that the "actor" desires to cause the consequences of his act, or he believes those consequences are substantially certain to result from it. *United Services Auto Ass'n v. Elitzky,* 358 Pa. Super. 362, 374, 517 A.2d 982, 989 (1986).

The court finds that defendants' actions were not intentional nor did defendants have reason to believe that the consequences of harm to the plaintiffs were substantially certain to result from the gasoline leak. Defendants did, in fact, take remedial measures and did cooperate with the investigating authorities in an attempt to pre-

vent harm to the community. Defendants are not liable for the tort of trespass.

Finally, plaintiffs have asserted a cause of action in negligence against defendants. The elements of negligence are the existence of a duty imposed by law or a recognized standard of care, breach of that duty, proximate cause and damages, *Martin v. Evans,* 551 Pa. 496, 711 A.2d 458 (1998). The Tank Act establishes standards for owners and operators of underground storage tanks containing gasoline and establishes the duty owed by such owners and operators. The Act makes it unlawful for a person to cause or allow a release of gasoline to occur from a storage tank and related equipment or to cause air, soil or water pollution. 35 P.S. §6021.1310. Here, gasoline was released from the storage tank at Ron's Exxon causing contamination of the soil and groundwater at the property. The gasoline released from the station flowed offsite into the Bell Atlantic vaults. The releases were, therefore, violations of the Tank Act and establish a breach of the duty imposed not to allow a release to occur from a storage tank. The release caused the vapors to invade plaintiffs' homes and resulted in the various physical symptoms experienced by plaintiffs. Several representative plaintiffs whose cases were tried during the first phase of this proceeding testified that they suffered various physical symptoms from breathing the gasoline vapors, including nausea, headaches, watery eyes, sore throats, and sinus problems. Plaintiffs' expert, Dr. Miller, testified that such symptoms are caused by exposure to gasoline vapors. In short, the court finds defendants' conduct negligent and finds that the causation for plaintiffs' injuries has been established.

The damages suffered by plaintiffs will be the subject of the second phase of this proceeding. The court has found that the defendants have violated the Tank Act and that the rebuttable presumption of section 1311 of the Tank Act is applicable. Further, the court has found that defendants are liable for public and private nuisance and negligence. No property damage has been alleged. It remains plaintiffs' burden to prove damages with reasonable certainty in the second phase of the proceedings.

## NON-JURY VERDICT

And now, June 13, 2001, the court finds in favor of plaintiffs and against the defendants, Exxon Corporation and Ronald S. Nichols, t/d/b/a Ron's Exxon, on plaintiffs' claims under the Pennsylvania Storage Tank and Spill Prevention Act, public nuisance and private nuisance and negligence and, in favor of defendants, Exxon Corporation and Ronald S. Nichols, t/d/b/a Ron's Exxon, on plaintiffs' claim for trespass. Damages are to be determined after further proceedings.